Martin I. **Lifoifoi**,
Plaintiff/Appellant,
**v.**
Ursula **Lifoifoi-Aldan**,
Defendant/Appellee.
Appeal No. 94-017
Civil Action No. 92-1281
June 24, 1996

Argued and Submitted April 11, 1996

Counsel for Appellant: Douglas F. Cushnie, Saipan.

Counsel for Appellee: Rexford C. Kosack, Saipan.

BEFORE: VILLAGOMEZ & ATALIG, Justices, and SALAS, Special Judge

VILLAGOMEZ, Justice:

¶1 ▮ Appellant, Martin I. Lifoifoi ("Martin"), appeals Superior Court orders striking certain evidence and granting summary judgment to his sister, Ursula Lifoifoi-Aldan ("Ursula"), sustaining the transfer of land from their mother to Ursula. Martin contends that their mother transferred the land to both of them, her only children, even though the deed contains only Ursula's name as grantee.

We have jurisdiction under 1 CMC § 3102(a). We reverse.

## ISSUES & STANDARDS OF REVIEW

¶2 ▮ Martin raises two issues for our review:

I. Whether the trial court erred in granting Ursula's motion to strike a document entitled "Deklarasion Inten sion Yan Facto" ("Deklarasion"). We review the trial court's decision to exclude evidence for an abuse of discretion.[5]

II. Whether the trial court erred in granting Ursula's motion for summary judgment. We review de novo the trial court's decision to grant summary judgment.[6]

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The trial court did not include a statement of undisputed facts in its order granting summary judgment. The record reveals undisputed facts as well as seemingly disputed facts.

### A. Undisputed Facts

¶4 Estefania Igitol Lifoifoi ("Estefania" or "mother") was born in 1925. She died in February 1995, during the pendency of this appeal. Martin and Ursula are her only children.

Estefania inherited the disputed property ("Tanapag

---

[5] *Estate of Deleon Castro*, 4 N.M.I. 102, 106 (1994).

[6] *Eurotex v. Muna*, 4 N.M.I. 280, 281 (1995).

land"), which is part of Lot 016 B 13 located in Tanapag, Saipan, from her father, Lorenzo Igitol. Title to the Tanapag land remained in the estate of Lorenzo until the probate of his estate was finalized in November 1989.

¶5 On November 24, 1987, Estefania transferred her interest in the Tanapag land to Ursula by deed of gift. Ursula prepared the deed and took her mother to the United States District Court in Saipan to have Canice Taitano, Deputy Clerk of Court, notarize the mother's signature on the deed.

Ursula transferred her interest in the land back to her mother by deed of gift on February 18, 1988.

¶6 On March 17, 1988, Estefania again transferred her interest in the Tanapag land to Ursula by deed of gift. Ursula again prepared the deed and took her mother to the District Court to have Canice Taitano notarize her signature on the document.

In April 1990, Ursula leased the Tanapag land to Tokai, U.S.A. for 55 years for $9,009,600. She gave Martin $1,250,000 of this money.

On May 16, 1992, Estefania signed the Deklarasion, a document written in Chamorro.

### B. Facts Alleged by Martin

¶7 While conducting research at the Commonwealth Recorder's office, Martin discovered the first deed of gift. He took it to his mother to ask her about it. Martin explained that it transferred the Tanapag land exclusively to Ursula. Estefania did not remember signing the deed. She became angry and told Martin to tell Ursula to give back the land. After Martin told Ursula what the mother said, Ursula returned the land.

¶8 Martin discovered the second deed of gift from Estefania to Ursula while conducting further research at the recorder's office. He took the deed to Estefania, who again did not recall executing it. Martin explained it. Estefania became angry, told Martin to tell Ursula to give the land back, and said that she did not intend Ursula to have the Tanapag land to Martin's exclusion.

¶9 Ursula refused to transfer the land back and said that she would speak directly to their mother. Ursula, Martin, and their mother spoke about this matter in April 1988. Ursula explained that she had had the interest in the property transferred to her so that she could protect it during the probate of Lorenzo Igitol's estate, and that she would return it to the mother at the conclusion of the probate proceedings. After Ursula left, Estefania told Martin that it was okay for Ursula to have the Tanapag land because she was holding it for his and Ursula's mutual benefit.

¶10 After Ursula leased the Tanapag land to Tokai, U.S.A., she and her mother visited Martin and his family at his home in Washington. Ursula told Martin, in the presence of their mother and Martin's family, that he was

entitled to half of the $9,009,600 in rent money. She then telephoned her husband in Saipan, and he told her that $1,000,000 had been deposited in Martin's account. Two months later, Ursula deposited an additional $250,000 into Martin's account.

¶11 Ursula refused to give Martin any more than $1,250,000. Martin complained to Estefania, who suggested that he prepare a document to correct this situation. He drafted the Deklarasion at Estefania's direction. At Estefania's request, Felipe Ruak orally translated the Deklarasion into Carolinian for her on May 15, 1992. The following day, she signed the Deklarasion and had it notarized.

¶12 The Deklarasion reads in relevant part, according to Martin's English translation:

### DECLARATION OF INTENTION AND FACT
### About All My Land and Wealth

I, Estefania . . . , reside in Tanapag and was born on Saipan. This writing that I am doing is for the reason that I make clear, complete and firm regarding that piece of land in Tanapag that I handed over to my daughter, Ursula L. Aldan .
. . .

I . . . have natural children in Martin . . . and Ursula . . . .

During the changes in the economy in our island of Saipan and many are looking for land to buy or lease, I decided that in between my two children, . . . I will hand over all my wealth to my two children so that it can help them forward in their lives and their children.

I . . . , like another parent, do truly love my two children Martin and Ursula equally.

I do not fully understand about paper work but do know that all wealth that is mine should be divided equally between my two children Ursula and Martin.

All documents that I place my signature on should and must be completely understood that regardless of who of the two siblings' name appears, both of the siblings are to divide it equally.

Furthermore, if there is anyone who is to pass judgment on what the intent of each document that I put my signature on it should be understood and recognized (end of page 1 of original) that the intention is that it be divided equally between the two siblings, Martin and Ursula.

There is no document that I signed that would give one and not the other, even though only one's name appears.

Furthermore, my land in Tanapag which is in Ursula's name, is known by my daughter that she is to divide it with her brother Martin equally, half, half.

I love Martin and Ursula equally and I cannot allow contradiction to my wishes that my belongings be divided equally between the two siblings, including the land that I placed under Ursula's name. Ursula understands that I put her name not for it to be her own, but for her to give her brother Martin his share of half.

Under God, in truth, and in a mother's deed, I am informing all that it affects that this intention by me be treated for all belongings that is [sic] mine.

It is my desire that the two siblings get along and that they follow my wishes that they divide equally between them all my belongings even[ ]though the document is under only one's name.

Under this document, the Tanapag land that is being leased by Tokai under Ursula's name, Ursula must divide it with her brother Martin equally.

I . . . place my signature on this document as it is correct and proper.

Response to Defendant[']s Motion to Strike the Affidavit Entitled "Deklarasion Intension Yan Facto" at Exh. A, *Lifoifoi v. Lifoifoi-Aldan*, Civ. No. 92-1201 (N.M.I. Super. Ct. filed Mar. 16, 1994).

### C. Denials by Ursula

¶13 In the affidavit Ursula filed in support of her motion for summary judgment, she states that a family meeting took place in March, instead of April, 1988. She does not say what transpired at that meeting. However, she states that after the family meeting, her mother told her that she could take back the land and keep it for herself and her children only.

¶14 Ursula denies the existence of an agreement that she would receive and hold the property for the benefit of both herself and Martin. She also denies: that the second deed of gift was temporary in nature; that she would hold the land only until completion of the probate of Igitol's estate; and that she would return the land to her mother. She further denies ever having told Martin that he was entitled to half of the rent proceeds.

¶15 Additionally, Ursula contends that she was never made aware that her mother wanted her and Martin to share and share alike in the Tanapag land. Finally, she states that she gave the $1,250,000 to Martin as an act of generosity to him as her brother.

### D. Proceedings below

3

¶16 Martin, on behalf of himself only and not Estefania, filed a complaint against Ursula in October 1992. He alleged, among other things, that the mother wanted to give her children equal shares of the Tanapag land, and that Ursula knew this but, by keeping all of the property for herself, refused to act in accordance with the mother's wishes. Martin claimed that Ursula's conduct constitutes (1) a breach of "the trust placed in [Ursula] by Estefania," Excerpts R. at 35, and (2) fraudulent misrepresentation.[7]

¶17 Ursula filed a motion to dismiss on the ground that Martin is not the real party in interest and therefore lacks standing, the real party in interest being the mother. Martin attached the Deklarasion as part of his response in opposition to the motion to dismiss, and thereby converted it to a motion for summary judgment.

¶18 Ursula, challenging the Deklarasion's admissibility, moved to strike it. The trial court granted the motion to strike, holding that the Deklarasion violates the parol evidence rule because Martin introduced it for the purpose of modifying or nullifying the second deed of gift from Estefania to Ursula.

¶19 In support of her motion for summary judgment, Ursula also argued that there exist no genuine issues of material fact as to either count of the complaint. The trial court agreed, holding that Martin failed to offer any admissible evidence showing that Estefania manifested an intent to create a trust at the time she executed the second deed of gift to Ursula in March 1988. In the absence of a manifestation of such intent, no trust could have been created. The trial court also ruled that Martin failed to offer sufficient admissible evidence that fraud occurred, and alternatively, that Martin, unlike the mother, has no standing to bring a claim based on fraud.

Martin timely appealed.

## ANALYSIS

¶20 ■ As an initial matter we note that the trial court in this case announced its ruling in open court and left it to counsel for Ursula -- the prevailing party -- to reduce the decision to written form. The record indicates that the court then signed and filed a verbatim copy of the order prepared by Ursula's counsel. Under such circumstances, we subject the court's order to particularly careful scrutiny.[8]

### I. Admissibility of the Deklarasion

¶21 ■ The trial court struck the Deklarasion on the ground that it violates the parol evidence rule. The RESTATEMENT (SECOND) OF TRUSTS supplies the applicable rule regarding the admissibility of parol evidence in this case:

> If the owner of property transfers it inter vivos to another person by a written instrument in which it is declared that the transferee is to take the property for [the transferee's] own benefit, extrinsic evidence, *in the absence of fraud, duress, mistake or other ground for reformation or rescission*, is not admissible to show that [the transferee] was intended to hold the property in trust.[9]

The second deed of gift executed by Estefania specifies that Ursula is "to have and to hold the [Tanapag land], together with all the improvements, tenements, heredita ments and appurtenances thereunto belonging unto her, her heirs only; and assign to her and her heirs forever." Excerpts R. at 44. The instrument effectively declares, in other words, that Ursula, "is to take the property for [her] own benefit."[10] Under the parol evidence rule, therefore, the Deklarasion would not be admissible as evidence of a prior agreement that Ursula would hold the land in trust for the benefit of herself and Martin, unless there was evidence of "fraud, duress, mistake or other ground for reformation or rescission."[11] Here, Martin did not offer the Deklarasion simply to support his allegation that at the time Estefania signed the deed, she believed she was transferring the land to both Ursula and Martin, or to Ursula to hold in trust for the benefit of both Martin and Ursula. Rather, he offered the Deklarasion in support of his broader theory that as a result of Ursula's fraudulent or otherwise wrongful conduct, his share of the interest in the

---

[7] In cases like this, where family members such as siblings have a dispute over ancestral land, we strongly encourage the trial court to conduct settlement conferences under Com. R. Civ. P. 16 to try to prevent the worsening of the family feud. Another judge, acting as a settlement judge, could speak separately with the parties accompanied by their respective counsel. The settlement judge should learn the terms of each party's bottom line for purposes of settlement. Several conferences might be needed to achieve a narrowing of the distance between the parties' positions. The settlement attempts should continue unless it appears that the gap in the parties' differences cannot be further reduced or eliminated and further mediation appears unrealistic. In this manner, the trial court could help the parties to settle their disputes amicably, resulting ideally in the satisfaction of all parties and the restoration of family relationships.

[8] *See In re Woodfield*, 978 F.2d 516, 519 (9th Cir. 1992) (Trott, J., concurring).

[9] RESTATEMENT (SECOND) OF TRUSTS § 38(1) (1959) (emphasis added).

[10] *Id.*

[11] *Id.*

4

land was never transferred to him and, as a result, an implied[12] constructive trust has arisen in his favor. He contends that the Deklarasion may be admitted for the purpose of proving the circumstances giving rise to a constructive trust. We agree.

¶22 ■ The parol evidence rule applies only in a situation where a written agreement is in force as a binding obligation.[13] Where an agreement to transfer property is found to be void or unenforceable due to misrepresentation, fraud or other wrongdoing, a constructive trust may be imposed.[14]

¶23 ■ A constructive trust is not an actual trust, but rather a relationship with respect to property that arises by operation of law.[15] As part of its equitable power, a court issues decrees establishing and enforcing constructive trusts on parties who have acquired title to property (transferees) to redress wrongs or to prevent unjust enrichment.[16]

¶24 ■ Where, as here, a party alleges fraud or another basis for imposing a constructive trust, the court will not exercise its equitable power unless there is clear and convincing evidence[17] that the transferee engaged in fraudulent or other wrongful conduct to procure the property in question.[18] Fraudulent conduct may be shown by parol evidence.[19]

¶25 Martin alleges that Ursula thwarted the creation or execution of an express trust by fraudulently procuring the second deed of gift from the mother, and by refusing to give him half of the rent money. As a result, asserts Martin, he has a right of action as a beneficiary to enforce a constructive trust. We hold that the trial court abused its discretion in striking the Deklarasion, because it may be admitted preliminarily for the purpose of proving the alleged fraudulent conduct. If Martin shows fraud by clear and convincing evidence, then, as discussed in section II, *infra*, he may use the Deklarasion secondarily to prove intention in the context of the imposition of a constructive trust.

## II. Grant of Summary Judgment

¶26 Martin alleges that his mother intended to transfer the land either to Ursula and him, or to Ursula expressly in trust for him and Ursula. However, according to Martin, Ursula fraudulently or otherwise wrongfully caused the mother to transfer the land to her for her own benefit. In his view, having received the land and the rent money, Ursula has refused to give him his full share of the rent money. He therefore asserts that equity has imposed a constructive trust on Ursula for Martin's benefit and he has a cause of action to force Ursula, under the constructive trust, to give him his share of the proceeds from the lease.

¶27 ■ Martin claims that a constructive trust in his favor has arisen out of an express trust that the mother created or attempted to create. He bases his claim on RESTATEMENT (SECOND) OF TRUSTS § 45. This section provides in pertinent part that,

> Where the owner of an interest in land transfers it inter vivos to another in trust for a third person, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the third person, if, but only if,
>
> (a) the transferee by fraud, duress or undue influence prevented the transferor from creating an enforceable interest in the third person, or
>
> (b) the transferee at the time of the transfer was in a confidential relation to the

---

[12] *Gast v. Engel*, 85 A.2d 403, 405 (Pa. 1952). Implied trusts may be classified as constructive or resulting. *See* RESTATEMENT OF TRUSTS, *supra*, § 1 cmts. d, e.

[13] *Muhm v. Davis*, 580 S.W. 2d 98, 101 (Tex. Ct. App. 1979).

[14] *See* RESTATEMENT OF RESTITUTION § 166 (1937).

[15] *See* RESTATEMENT OF TRUSTS, *supra*, § 1 cmt. e.

[16] *Id.* § 1 cmt. e; *id.* § 45 cmt. a; *Rogolofoi v. Guerrero*, 2 N.M.I. 468, 480 (1992). As one court explained,

> [I]f a party obtain[s] the legal title to property . . . under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations a court of equity will raise a trust by construction, and fasten it upon the conscience of the offending party, and convert him into a trustee of the legal title.

*McCormick v. McCormick*, 33 N.W. 2d 543, 545-46 (Neb. 1948) (internal quotation marks omitted).

[17] *Pangelinan v. Itaman*, 4 N.M.I. 114, 120 (1994) (noting that fraud must be proved by clear and convincing evidence).

[18] *Cave v. Cave*, 593 S.W. 2d 592, 597 (Mo. Ct. App. 1979).

[19] *See Muhm, supra note 9, 580 S.W. 2d at 101-02.*

transferor . . . .[20]

Under § 45, Martin must first prove that Estefania created or attempted to create an express trust, and then at least one of the two conditions giving rise to a constructive trust.[21]

¶28     In order to establish an express trust,[22] Martin must show: (a) a settlor (purportedly Estefania); (b) transferred an interest in property (the Tanapag land); (c) to a trustee (allegedly Ursula); (d) for the benefit of ascertainable beneficiaries (purportedly Ursula and Martin); and (e) at the time of the transfer, manifested an intent to create the trust.[23] The parties do not dispute that Estefania transferred the Tanapag lot by a deed of gift that names Ursula and her heirs and assigns as grantees. Excerpts R. at 43. Therefore, the dispositive question for purposes of Martin's express trust theory is whether Martin can prove that, at the time of the transfer of the land, Estefania manifested an intent to have Ursula hold it in trust for the benefit of Ursula and Martin.

¶29   Ursula maintains that Martin failed to produce any evidence that Estefania intended to create a trust, much less one partially in his favor. Martin contends, however, that he presented the trial court with enough credible evidence to create conflicting inferences about Estefania's intent and, consequently, adequate to overcome a motion for summary judgment.[24] We agree with Martin.

---

¶30   "Manifestation of intention" by the settlor (here, Estefania) means an external manifestation rather than an undisclosed intention to create a trust. The settlor need not know that the intended relationship is called a trust, or the precise attributes of the relationship which is called a trust.[25]

¶31   The settlor may manifest his or her intention by spoken words, written words or conduct.[26] "No particular form of words or conduct is necessary for the manifestation of intention . . . ."[27] The settlor's intention to create a trust at the time of transfer of the property may "be shown by facts occurring after that time to the extent that evidence of such facts is admissible to show such intention under the rules of evidence."[28] With respect to the settlor's conduct in particular, acts prior to and after, in addition to acts contemporaneous with the manifestation which is claimed to create a trust, may be relevant in determining the settlor's intention.[29]

Martin presented the following evidence:

¶32   a. His sworn statement that when he explained to his mother that the first deed transferred the Tanapag land exclusively to Ursula, his mother instructed him to tell Ursula to return the land. Excerpts R. at 1-2.

¶33   b. Ursula's and Martin's sworn statements that a family meeting occurred in 1988. It is unclear whether the meeting occurred before or after March 17, 1988, the day on which the mother executed the second deed to Ursula. Ursula's affidavit indicates that "a family meeting occurred" sometime between March 1st and 17th. *See* Excerpts R. at 15. Martin's affidavit states that the meeting in question occurred in April 1988, which would have been after the mother signed the deed. Excerpts R. at 3. Nevertheless, Martin alleges that at the meeting Ursula told Martin and their mother that she would hold the land temporarily until the probate of the Igitol estate

---

[20] RESTATEMENT OF TRUSTS, *supra*, § 45(1). *See also* RESTATEMENT OF RESTITUTION. *supra*, § 183.

[21] *See Kay v. Kay*, 763 S.W. 2d 712, 713 (Mo. Ct. App. 1989) (discussing substantially identical RESTATEMENT OF RESTITUTION § 183).

[22] An express trust may be written or oral. Under Commonwealth law, oral trusts in real property are unenforceable because they fail to meet the requirements of the Statute of Frauds. 2 CMC § 4912; RESTATEMENT OF TRUSTS, *supra*, § 43 (stating rule that transferee/trustee cannot be compelled to perform oral trust of an interest in land created inter vivos). However, under certain circumstances, the transferor or intended beneficiary may seek, as Martin has, to have a constructive trust imposed upon the trust property.

[23] RESTATEMENT OF TRUSTS, supra, §§ 2-4.

[24] As the moving party, Ursula has the initial burden of affirmatively "'showing' -- that is, pointing out to the [trial court] -- that there is an absence of evidence to support [Martin's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986) (discussing corresponding Fed. R. Civ. P. 56). Ursula has met this burden. In response, Martin must call the trial court's attention to supporting evidence in the record that the moving party overlooked or ignored. *Id.* at 332, 106 S. Ct. at 2557 (Brennan. J., dissenting). Martin met this

---

burden. Ursula, in order to satisfy her ultimate burden of persuading the court that there is no genuine issue for trial, then must demonstrate that the evidence identified by Martin. in its entirety, is inadequate. *Id.* at 332-33, 106 S. Ct. at 2557-58; Com. R. Civ. P. 56; *Santos v. Santos*, 4 N.M.I. 206, 210 (1995) (internal quotation marks omitted) (holding that defendant who moves for summary judgment bears the "initial and ultimate burden of establishing . . . entitlement to summary judgment"). Ursula has not met this ultimate burden.

[25] RESTATEMENT OF TRUSTS, *supra*, § 23 cmt. a.

[26] *Id.* § 23 cmt. a, *id.* § 24(1).

[27] *Id.* § 24(2).

[28] *Id.* § 4 cmt. a.

[29] *Id.* § 24 cmt. b.

concluded, and then she would return the land to the mother. Excerpts R. at 3.

¶34    c. Martin's sworn statement that, when he explained to their mother that the second deed to Ursula did the same as the first, she gave the same instruction about having Ursula return the land, and specifically mentioned that the land was not for Ursula alone. Excerpts R. at 2.

¶35    d. Martin's sworn statement that prior to leasing the land, Ursula told him on two separate occasions that he would be entitled to half of the rent money. Excerpts R. at 3.

¶36    e. Martin's sworn statement that in August 1990, after leasing the land, Ursula traveled with her mother to Washington State and told Martin, in the presence of their mother and Martin's family, that he was entitled to half of the rent money. Ursula then confirmed with her husband on Saipan that $1,000,000 had been deposited into Martin's bank account. Later, Ursula deposited another $250,000 into Martin's account. Excerpts R. at 3-4. Ursula and her mother visited Martin in Washington State again in 1991, and again Ursula promised, in the mother's presence, to give Martin the balance of his share of the rent money. Excerpts R. at 4.

¶37    f. The Deklarasion, which the mother executed in 1992, stating that even though the second deed to Ursula recites only Ursula's name, she intended to transfer the land to both children.[30]

¶38    ■ Viewed as a whole and in the light most favorable to Martin, we conclude that this constitutes sufficient evidence of the existence of a genuine dispute about a material fact. That is, the evidence is such that a reasonable trier of fact could return a verdict for Martin -- the nonmoving party -- on the issue of whether the mother transferred an interest in the Tanapag land to Ursula for both Ursula and Martin. We hold, therefore, that the trial court erred in finding no genuine issue of material fact in dispute.

¶39    ■ Through the evidence produced by Martin in response to the summary judgment motion, he has shown that he has standing to proceed in this action as a third-party beneficiary or donee.[31] We have previously noted

that in general terms, the concept of standing is used to determine whether "a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court."[32]

¶40    In support of his assertion that a constructive trust should be imposed in his favor under the rule of RESTATEMENT (SECOND) OF TRUSTS § 45, Martin tendered evidence -- including the Deklarasion -- that Ursula: (1) procured the deed to the Tanapag land through tortious conduct or while in a confidential relationship[33] with the mother, and (2) refused to perform or fully perform the trust. This evidence tends to prove § 45's two implementing provisions, §§ 45(a) and 45(b). Thus we are satisfied that, if Martin convinces the factfinder on remand that the mother created or attempted to create a trust (i.e., that she transferred or attempted to transfer the Tanapag land to Ursula for the benefit of both Martin and Ursula), then the court will be faced with a justiciable controversy concerning Martin's entitlement to relief under § 45.[34]

## CONCLUSION

¶41    For the above reasons, we hereby **REVERSE** the Superior Court's orders striking the Deklarasion and granting summary judgment in favor of Ursula, and **REMAND** for further proceedings consistent with this opinion.

---

RESTATEMENT OF RESTITUTION § 183(b)): *Kay, supra*, 763 S.W.2d at 713 (discussing requirements of RESTATEMENT OF RESTITUTION § 183).

[32]  *Borja v. Rangamar*, 1 N.M.I. 347, 359-60 (1990).

[33]  A confidential relationship exists, among other circumstances, "where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment or advice of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." RESTATEMENT OF RESTITUTION, *supra*, § 182 cmt. c. *See also Dorame v. Terlaje*, Civ. Action No. 92-1572 (N.M.I. Super. Ct. Jan. 25, 1993) (decision and order on plaintiff's motion for partial summary judgment at 4-6).

[34]  We note also that in opposing Ursula's motion for summary judgment, Martin produced sufficient evidence to proceed to trial on his broader claim that Ursula wrongfully obtained property that Estefania otherwise would have given to Martin. *See* RESTATEMENT OF RESTITUTION, supra, §§ 125, 133, 169. Under both theories, the court may decree a constructive trust, but if and only if the claimant (here, Martin) meets his or her burden of establishing such a trust by "clear, cogent and convincing evidence." *Etheridge v. Hammer*, 450 S.W.2d 207, 210 (Mo. 1970) (applying RESTATEMENT OF RESTITUTION § 183); *Estate of Sheets v. Sheets*, 558 S.W.2d 291, 295 (Mo. Ct. App. 1977) (same).

---

[30]  We emphasize again that Martin may not use the Deklarasion to show Estefania's intent unless he has first shown fraud by clear and convincing evidence. *See* Analysis section I, *infra*.

[31]  Pursuant to the RESTATEMENT OF TRUSTS, for example, "a constructive trust for the third person [Martin] will be enforced where the transfer [of an interest in land] was wrongfully obtained; or where the transferee [Ursula] was in a confidential relation to the transferor [the mother] . . . ." RESTATEMENT OF TRUSTS, *supra*, § 45 cmt. a (internal citations omitted). *See also Muhm, supra*, 580 S.W. 2d at 103 (recognizing intended beneficiary's standing to seek constructive trust under RESTATEMENT (SECOND) OF TRUSTS § 45(b) and corresponding